(32 App. Div. 503.)

## READ v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Appellate Division, Second Department. July 23, 1898.)

1. STREET RAILROADS—INJURY TO PERSON ON STREET—CONTRIBUTORY NEGLIGENCE.

If, in an action for damages for personal injuries received by a decedent in a collision with a trolley car, there is some evidence, growing out of the facts and circumstances of the case, and out of the presumption that the decedent would not intentionally drive in front of a near and swiftly-approaching car, which might justify reasonably minded men in differing as to the presence or absence of contributory negligence, the question should be submitted to the jury.

2. SAME—DUTY TO LOOK AND LISTEN.

The necessity of looking and listening before attempting to cross the tracks of a steam railroad does not apply in the case of a street surface railroad, where both parties are making use of the highway, and where the crossing is made at the intersection of streets. In that case both parties are required to use such care as ordinarily prudent men would use under the circumstances.

3. DEATH BY WRONGFUL ACT—DAMAGES.

Upon the question of the amount of damages sustained by the widow and next of kin of a decedent through his death by wrongful act, evidence of his profits from a temporary partnership, doing work under public contracts secured by competitive bidding, and involving the use of capital, and his part in the operations of which is not shown, is too speculative, and is accordingly incompetent.

Appeal from trial term, Kings county.

Action by Carrie E. Read, administratrix of John J. Read, deceased, against the Brooklyn Heights Railroad Company. From a judgment of $29,966.82, and from an order denying a new trial, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Charles A. Collin, for appellant.

Samuel S. Whitehouse, for respondent.

WOODWARD, J. This is an action to recover damages sustained by the widow and next of kin of John J. Read, deceased, in consequence of his death through the alleged negligence of the defendant. The evidence as to the accident was substantially all furnished by the conductor and motorman of the defendant at the time of the accident, who have since left the employ of the company; and the facts submitted to the jury tended to establish that on the 23d day of August, 1895, the plaintiff's intestate was killed by coming into

53 N.Y.S.—14

collision with one of the cars of the defendant at the junction of
Eighty-Sixth street and Twenty-Second avenue, in the suburbs of
Brooklyn. The accident occurred about 1 o'clock in the morning of
that day, and while the car of the defendant was making its last
trip for the night to Ulmer Park. The plaintiff's intestate was driv-
ing alone in a light wagon or surrey, and the vehicle was struck on
the left hind wheel, throwing the occupant to the ground, some 60
feet away, killing him almost instantly. The conductor and motor-
man at the time made out written statements detailing the accident,
and these were afterwards supplemented by affidavits, in which it was
stated that the car was moving at the regular schedule rate of speed,
or about eight or nine miles an hour; and the conductor says:

"I was at my post on car going through Eighty-Sixth street, and all at
once I heard the gong ring and motorman yell at same time. I looked ahead
and saw team of horses attached to a carriage run in front of car. It was
too late for the motorman to stop car. Car struck wagon, throwing man
to curb, and, striking his head, killed him most instantly."

The motorman said:

"One man in carriage drive at high speed across the tracks. I rong my
dong and asked him to stop but he keep on going when my fender cort
his hind wheel tiping his carriage over and knocked him out on the curbe
stone with caused his deth."

On the trial the conductor and motorman contradicted the state-
ments which they had made at the time of the accident, and swore
that the car was running at from 25 to 30 miles an hour, that no
gong was sounded, and that the team was upon the track over which
the car was moving before it was discovered by the motoneer. These
two witnesses were the only ones who were present at the time of the
accident, and at the trial the conductor testified that he was sitting
upon the rear seat of the car, making out his report; that he was
riding backward, and that he did not see the team or the wagon until
after the accident; that the first intimation he had of the accident
was one stroke of the gong, followed by the crash, and a cloud of
dust as the car flew past. He says that the car proceeded nearly a
block before it stopped, and that he then reversed the trolley pole,
and the car ran back to where the accident occurred.

The case, as it is presented by the witnesses at the trial, indicates
that the plaintiff's intestate was driving alone on Twenty-Second ave-
nue. The thoroughfare is a hundred feet wide, affording a view of
the defendant's tracks on Eighty-Sixth street for several hundred
feet. Eighty-Sixth street is also a hundred feet wide. And the
evidence tended to establish that the car and the vehicle, traveling
at the rate of speed which was in evidence, would be in plain view
of each other for the period of seven seconds, and that plaintiff's in-
testate would have had ample opportunity, up to the last second before
the collision, to turn his horses into Eighty-Sixth street, and have
avoided the fatal contact. It is conceded that, under the evidence
as presented at the trial, the defendant was negligent; but it is
urged, with much reason, that the plaintiff has not established, by
that fair preponderance of evidence which actions of this kind de-
mand, that the plaintiff's intestate was free from negligence contrib-

uting to the accident. That there was no affirmative evidence of this lack of negligence on the part of the deceased is certainly beyond dispute. There was no attempt in this direction. But it was held in the case of Hart v. Bridge Co., 80 N. Y. 622, that "when, from the circumstances shown, inferences are to be drawn which are not certain and incontrovertible, and may be differently made by different minds, it is for the jury to make them"; and the trial court seems to have been of the opinion that this was such an instance. "It is not necessary," continue the court in the case cited above, "to warrant us in adjudging that there was error in granting the nonsuit, for us to be convinced that the legal probabilities are so strong as that the plaintiff is entitled to a verdict. What we have to arrive at is this: That there were facts in this case which were not so weak as to give no support, in some fair and sound minds, to such legal probabilities,—so weak as that the law will not tolerate that a verdict should be founded upon them. We are not to be able to say that the facts, and the inferences to be had from them, are enough to convince our own minds that the intestate died there without negligence on her part, and by the negligence of the defendant. What we are to be able to say is this: That the case is not clear against the plaintiff as that there is no room for doubt; that there are facts and circumstances which are proper to be submitted to the consideration of the triors of fact." The accident happened at an intersection of two streets, where the rights of both parties were equal; and it is urged that the plaintiff's intestate, if he had been watchful, and had been exercising the care and prudence demanded of him by the circumstances of this case, had a right to presume that the car of the defendant, in approaching a crossing of streets, would be within the control of the motorman, and that it would be so reduced as to its speed that he would have time to cross in safety. The learned trial court charged the jury that if the plaintiff's intestate "started to cross that track within a distance of forty feet of the approaching car, going at the rate of thirty miles an hour, and appreciated the speed, there can be no recovery"; and this is, we believe, as far as the court was justified in going, under the circumstances of this case. A mere error of judgment on the part of the deceased, coupled with his right to assume that the car would be operated prudently, could not defeat the right of the plaintiff to recover in this action; and, while we are not satisfied that there was evidence enough in the case to establish the conclusion which must have been reached by the jury, this branch of the case is not for us to pass upon. There was some evidence, growing out of the facts and circumstances of this case and out of the presumption (which must exist) that this man would not intentionally drive in front of a rapidly approaching car, which might justify reasonably minded men in differing as to the negligence or absence of negligence on the part of the plaintiff's intestate; and we are of opinion that the case was, under the charge of the trial court, properly submitted to the jury.

It is insisted, in connection with the above, that the plaintiff's intestate was, as a matter of law, bound to look and listen before attempting to cross the tracks of the defendant, and that, in the ab-

sence of proof that the deceased did so look and listen, the defendant is entitled to a verdict. This would be the law in respect to a steam railroad; but it does not apply to a street surface railroad, where both parties are making use of the highways, and where the crossing is made at the intersection of streets. There both parties are bound to use that degree of care which ordinarily prudent men would use under the circumstances,—a degree of care commensurate with the dangers to be reasonably anticipated at such a crossing; and this rule was clearly stated by the trial court.

While we are of opinion that the evidence as to the accident, and the questions of negligence on the part of the plaintiff's intestate as well as that of the defendant, were properly submitted to the jury, we are unable to sustain the judgment, because of the error of the trial court in admitting the evidence of John O'Grady, in which he is allowed to testify, over the objection of the defendant, to the net income of John J. Read, plaintiff's intestate, from the general business of a partnership existing between Read and O'Grady. It appeared from the subsequent testimony that this firm was engaged in contracting with the city of Brooklyn for cleaning out sewers, etc.; that they had considerable capital invested, aggregating $5,000 to $6,000 each; and that they employed from 20 to 100 men in the work. This the defendant moved to have stricken out on the ground that it was "incompetent, immaterial, and irrelevant; that it is speculative and uncertain in its character, and is no evidence of earning capacity of deceased, or of what would be the probable earning capacity of the deceased, he being a contractor, subject to and dependent upon bids; and that a portion of the money earned was received from capital invested,"—and on the further ground that "part of the money that was divided between the two was a portion of capital invested." The evidence indicated a very loose form of partnership, without any written agreement, or any books being kept. Mr. O'Grady testifies:

"He was an equal partner with me. He furnished capital to the partnership business. He furnished one-half. I guess that was about five or six thousand dollars. We had no books in the concern; only simply divided at the end of every month; only the time books of the men. We kept no books, no partnership books, other than the time books of the men."

There was no evidence in this of the earning capacity of the deceased. It does not even appear that he devoted any time or energy to the business, or that he was in any sense essential to the business, except that he advanced money to buy materials, to purchase tools, and to pay the men whom they employed. The contracts were only for a short period of time, and were secured by competitive bidding; and the fact that the firm may have divided $14,000 in one particular year has no more relevancy to the earning capacity of the deceased than evidence that he had, from a like investment, realized a like profit by operating in Wall street. "These profits," say the court in the case of Masterton v. Village of Mt. Vernon, 58 N. Y., at page 396, "depend upon too many contingencies, and are altogether too uncertain to furnish any safe guide in fixing the amount of damages. In Walker v. Railway Co., 63 Barb. 260, it was held that proof of the amount of income derived by the plaintiff for the year preceding

the injury, from the practice of his profession as a lawyer, was competent.    This goes beyond the rule adopted in any of the other cases, and it certainly ought not to be further extended.    Whether proof of the income derived by a lawyer from the past practice of his profession is competent for the purpose of authorizing the jury to draw an inference as to the extent of the loss sustained by liability to personally attend to business, may, I think, well be doubted.    There is no such uniformity in the amount in different years, as a general rule, as to make such inference reliable.    But the profits of importing and selling teas are still more uncertain.    In some years they may be large, and in others attended with loss.    The plaintiff had the right to prove the business in which he was engaged, its extent, and the particular part transacted by him, and, if he could, the compensation usually paid to persons doing such business for others. These are circumstances the jury have a right to consider in fixing the value of his time.    But they ought to be permitted to speculate as to the uncertain profits of commercial ventures in which the plaintiff, if uninjured, would have been engaged."    If this was true of an importer of tea, where the continuance of the business was reasonably certain, it applies with greater force where the business depended for its very existence upon the result of competitive bidding for public contracts.    In the case at bar there were not only the risks of business losses, but there was an uncertainty even of having any business; and the partnership between Messrs. O'Grady and Read was a mere temporary affair, in which the profits were divided from month to month.    In the case of Masterton v. Village of Mt. Vernon, supra, the plaintiff had testified that he was in the tea importing and jobbing business, buying and selling teas, and had been for a great number of years; that he had a partner who attended to the sales, while he made the purchases; that in purchasing teas a high degree of skill was necessary, which the plaintiff possessed; that the business was extensive; that in consequence of the injury the plaintiff could not purchase teas, and there was a great falling off in the business of the firm.    The court of appeals, in discussing the case, at page 395, speaking through Judge Grover, say:

"I also think the judge erred in overruling the defendant's objection to the following question: 'About what had been your profits, year by year, in that business?' "

Continuing the discussion, the court say:

"In Lincoln v. Railroad Co., 23 Wend. 425, it was held, in an analogous case, that the plaintiff might prove that he was engaged in the dry-goods business, and its extent; but there was no attempt to prove the past profits of the business, with a view to show what the future would be.    Where, in such a case, the plaintiff has received a fixed compensation for his services, or his earnings can be shown with reasonable certainty, the proof is competent.    McIntyre v. Railroad Co., 37 N. Y. 287; Grant v. City of Brooklyn, 41 Barb. 381.    In Nebraska City v. Campbell, 2 Black, 590, it was held that proof that the plaintiff was a physician, and the extent of his practice, was competent.    Wade v. Leroy, 20 How. 34, held the same.    In none of these cases is any intimation given that proof may be given as to the uncertain future profits of commercial business, or that the amount of past profits derived therefrom may be shown, to enable the jury to conjecture what the future might probably be."

In the case of Ehrgott v. Mayor, etc., 96 N. Y. 264, cited in behalf of the plaintiff, there is no modification of this doctrine; for the court distinctly say, at page 276:

"So here the plaintiff's income was not from capital invested, but solely from his personal skill and services; and his earnings for the six or seven years showed what his services were worth to himself, and what he was capable of earning, and thus gave the jury a basis from which to estimate his pecuniary loss."

That was a case where the plaintiff, who had been injured, had been engaged in selling encyclopedias on commission, and he was permitted to show what he had earned in selling these books during a period of six or seven years. The court say:

"It would have aided the jury but very little to place before them the nature of his business, and the number of volumes of the cyclopedia sold. The question was how much did he earn, and how much was he capable of earning; and proof which would furnish answers to these questions would enable the jury to determine how much he had lost from his inability to continue his vocation."

If the plaintiff in the case at bar had introduced evidence to show that the earnings of the co-partnership were dependent upon the skill of the deceased, or that the services which he personally performed were of a certain value, there would have been no reasonable doubt of its competency; but, under the rule recognized by the court of appeals in the cases above cited, we are unable to see how the evidence of Mr. O'Grady as to the net income of the firm from a speculative contract could be competent as showing the earning capacity of the deceased. "There," say the court in the case of Ehrgott v. Mayor, etc., supra, in distinguishing Masterton v. Village of Mt. Vernon, 58 N. Y. 391, "the profits resulted both from capital and services, and the services were rendered both by the plaintiff and his partner; and hence it could not be known how much of the profits were due alone to the plaintiff's skill and services. It was under such circumstances that it was held that the profits, depending upon all the contingencies of trade and commerce, of wind and water, were too uncertain as a guide for the jury." And this is the situation in the case at bar. "In no case has it been permitted," say the court in the case of Johnson v. Railway Co., 52 Hun, at page 114, 4 N. Y. Supp. 849, "where the profits of business arise from the investment of capital, that evidence of such profits should be offered for the purpose of enhancing the damages. It is only in cases where the earnings proceed entirely from the plaintiff's labor that the evidence becomes admissible." This doctrine is clearly recognized by Mr. Justice Cullen in the case of Thomas v. Railway Co., 18 App. Div., at page 188, 45 N. Y. Supp. 923, where he says, in delivering the opinion of the court, that:

"We think the evidence of the plaintiff's earnings was properly admitted. The occupation in which he was engaged, in partnership with his father and brother, simply employed the personal services of the parties. Its earnings in no way proceeded from the use of capital, nor were subject to the hazard of business ventures."

See Grant v. City of Brooklyn, 41 Barb., at page 384.

In the case of Dickinson v. Hart, 142 N. Y. 183, 36 N. E. 801, relied upon by the plaintiff to support the admission of the evidence as to

the net earnings of the firm of which the plaintiff's intestate was a member, the action was for a breach of contract; and, as was said in the case of Walker v. Railway Co., 63 Barb., at page 267:

"The rule so carefully maintained and guarded in actions upon contracts, and for tortious injuries to property, is incapable of being applied where the injury is to the person; for those injuries are without precise pecuniary measure."

The court clearly recognized the correct rule, for it was said:

"But the peculiar nature of this agreement is such that the only general rule of damages which could be applied was the value of the agreement to the plaintiff at the time of its breach."

Under this view of the case, the plaintiff was allowed to prove the gross amount of his sales in each of the two years he was in the defendant's store, and the amount of his net profits, showing that during the last year his sales and profits had largely increased. Clearly, this has no analogy to the case at bar, where the effort is to arrive at the pecuniary loss sustained by reason of the death of plaintiff's intestate, due to the negligence of the defendant.

"Loss of profits consequent upon a tort as well as a breach of contract are allowed," say the court in the case of Schile v. Brokhahus, 80 N. Y., at page 620, "provided they are such as might naturally be expected to follow from the wrongful act, and are certain, both in their nature, and in respect to the cause from which they proceed. * * * If a business is entirely broken up, the amount previously done is ordinarily pertinent upon the question of the amount which might subsequently be done, and the same is true of a partial interruption of business." This case, also cited in behalf of the plaintiff, is far from sustaining the trial court in its ruling upon the admission of the evidence of Mr. O'Grady, and a careful scrutiny of the authorities fails to find anything which tends in that direction. We are forced to conclude, therefore, that it was error to admit this evidence.

The judgment and order appealed from should be reversed, and a new trial granted; costs to abide the event. All concur.